## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**MICHAEL E. QUINN,**

      **Plaintiff,**

            **v.**                       **Docket No. 05-10313RCL**

**HOME DEPOT, U.S.A., INC.,**

      **Defendant.**

## DEFENDANT HOME DEPOT, U.S.A., INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**I.**    **Introduction**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rules 7.1(B)(1) and 56.1 of the Local Rules of the United States District Court for the District of Massachusetts, Defendant Home Depot, U.S.A., Inc. ("Home Depot") hereby submits the following Memorandum of Law in support of its Motion for Summary Judgment. The Court should grant Home Depot's motion because the undisputed facts in the record cannot support Plaintiff's claim that he was wrongfully terminated in violation of a clearly defined public policy.

Plaintiff Michael Quinn ("Plaintiff" or "Mr. Quinn") was terminated from employment with Home Depot on January 9, 2004 for *admittedly* operating a forklift without a seatbelt as required by Home Depot's safety policy. This was the second safety violation for which Plaintiff had been counseled in four months. Plaintiff had been observed and spoken to in September, 2003 for admittedly operating a forklift without a "spotter" in an area of Home Depot readily accessible to customers. Plaintiff, however, believes that he was terminated not because of these

two safety violations occurring within a short period of time but because several months earlier he had made an internal report of alleged suspicious activity by customers to his then store manager and Home Depot's district loss prevention manager.  Plaintiff has brought a single count Complaint against Home Depot alleging a claim for wrongful termination in violation of public policy.  This claim fails as a matter of law.

As is set forth in greater detail below, the undisputed material facts in the record demonstrate that the individuals who made the decision to terminate Plaintiff's employment had no knowledge whatsoever of the internal report of alleged suspicious customer conduct that Plaintiff had made several months earlier.  Thus, the decision to terminate his employment could not have been caused by this internal complaint of suspicious customer conduct.  Rather, Plaintiff was terminated for a legitimate, non retaliatory reason.  Moreover, Plaintiff's report to his managers of a conversation with a customer that he deemed suspicious does not fall within the conduct recognized as a public policy exception to at-will employment under Massachusetts law.

## II.     Statement of Material Facts as to Which There is No Genuine Dispute

Defendant relies upon and incorporates herein by reference its Statement of Material Facts as to Which There is No Dispute, filed herewith.

## III.     Argument

### A.     Standard of Review

Plaintiff's claim must be dismissed because there is no issue of material fact in dispute and Home Depot is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c);  *Morrissey v. Boston Five Cents Sav. Bank*, 54 F.3d 27 (1st Cir. 1995).  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; only a genuine issue of material fact is effective in this regard.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Such a "genuine" issue exists if there is evidence from which a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 257.  In order to show the existence of a genuine issue capable of defeating summary judgment, the non-moving party must present specific factual evidence.  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party cannot rest upon mere conclusory allegations, unsupported speculation or denials.  *Burns v. State Police Association of Massachusetts*, 239 F.3d 8, 9 (1st Cir. 2000); *Coll v. PB Diagnostic Systems, Inc.*, 50 F.3d 1115, 1121 (1st Cir. 1995).  *See also Conward v. Cambridge School Committee*, 171 F.3d 12 (1st Cir. 1999)(court will resolve genuine fact disputed in favor of non-moving party but will not "indulge rank speculation or unsupportable hyperbole").

     **B.**     **An Employee's Report to A Manager of A "Suspicious" Conversation With A Customer Is Not Recognized As A Public Policy Exception to Employment At-Will**

The Court must grant summary judgment because Plaintiff has not and cannot identify a clearly defined public policy that was the reason for his discharge from employment. Massachusetts has recognized an exception to the doctrine of employment-at-will where a discharge is "for a reason that violates a clearly established public policy."  *Upton v. JWP Businessland*, 425 Mass. 756 (1997).  As summarized by the Massachusetts Court of Appeals, this cause of action is only available in narrowly proscribed circumstances:

> "Redress is available for employees who are terminated for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury)." *Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch.*, 533 N.E.2d 1368, 1371 (Mass. 1989).  Legal redress is also available for employees 'terminated for performing important public deeds, even though the law does not absolutely require the performance of such a deed,' *Flesner v. Techical Communications Corp.*, 575 N.E.2d 1107, 1111 (Mass. 1991).  For example, an internal or external complaint made about an alleged violation of criminal law, or 'whistle blowing,' falls into this category. *See Shea*

*v. Emmanuel College*, 682 N.E.2d 1348, 1350 (Mass. 1997). . ."

*Hinchey v. Nynex Corp.*, 144 F.3d 134, 145 (1st Cir. 1998).   *See* also, *Flynn v. City of Boston*, 59

Mass. App. Ct. 490, 493 (2003)("Our courts have consistently interpreted any public policy

exception to the [at-will] rule in a very narrow sense.  *Smith-Pfeffer v. Superintendent of the*

*Walter E. Fernald State Sch.*, 404 Mass. 145, 150 (1980)(to do otherwise would convert the

general rule 'into a rule that requires just cause to terminate an at will employee')."

Although the Massachusetts Supreme Judicial Court in *Shea v. Emmanuel College*

recognized that it is important to encourage employees to report alleged violation of criminal law

to their employer, neither the Massachusetts Supreme Judicial Court nor any other Massachusetts

court has *ever* interpreted the public policy exception so broadly as to permit a cause of action for

an employee who simply reports a suspicion of possible fraudulent conduct.  Indeed, courts in

other jurisdictions have also refused to extend protection to whistleblowers who report conduct

that is less than clearly a violation of criminal law.  *See e.g.*, *Suchodolski v. Michigan*

*Consolidated Gas Co.*, 316 N.W.2d 710 (Mich. 1982)(no protection for discharged employee who

reported "questionable" company accounting practices.)

Here, the conduct that Plaintiff is basing his public policy wrongful termination claim on

does not in any way approach that necessary to support his claim.  The record reflects that

Plaintiff made a report to his store manager and the regional loss prevention manager that a

customer had asked him questions which he found to be of a suspicious nature.  (*See Rule 56*

*Statement of Material Facts Not in Dispute ("Rule 56 Statement"), at ¶ 9).*  The specific

questions that the customer asked which Plaintiff found to be suspicious was: "are there any deals

on snowblowers?" and "you work outside, don't you?"[1] (*Id.*)   While Plaintiff claims that he

found this conversation with this customer to be "suspicious" in light of the alleged rumors he

was hearing in the store regarding theft, a report of a mere suspicion based on rumor (as opposed

to a report of actual criminal wrongdoing) cannot serve as the basis for establishing a public

policy exception to the employment at-will doctrine under *Shea v. Emmanuel*.  Indeed, reports of

"suspicious" customers are commonplace in a retail environment and the Massachusetts courts

have never broadened the narrow public policy exception to capture such a wide category of

workplace discussions.

C.     **Plaintiff's Wrongful Termination Claim Must Be Dismissed As a Matter of Law**
       **Because He Cannot Show That The Decision-Maker Knew of Internal Complaint**

Even if the Court were to decide that Plaintiff's report of "suspicious" customer conduct

can serve as a sufficient public policy to warrant an exception to the employment at-will doctrine,

Plaintiff's claim for wrongful termination in violation of public policy still fails because he cannot

show that the individuals who made the decision to terminate him, Store Human Resources

Manager Chris Hoban and the new Store Manager Peter McNamara[2], were aware of Plaintiff's

previous report of alleged suspicious customer conduct to the former store manager and the

regional director of loss prevention.

Numerous state and federal court decisions in Massachusetts have recognized in

employment retaliation cases, a plaintiff must prove actual knowledge of the plaintiff's prior

actions by the decision maker to sustain such a claim.  Thus, for example, in order for retaliation

---

[1]     These "suspicious" questions which were allegedly asked Plaintiff by a customer are, on their face, wholly innocuous.  Indeed, these very questions are ones that countless Home Depot associates are asked every day by customers looking for a bargain on merchandise.

[2]     Mr. McNamara did not become store manager until October, 2003, several months after Mr. Quinn had reported his "suspicious" conversation to Mr. McNamara's predecessor, Robert Murphy.  *(Rule 56 Statement, at ¶ 13).*

claims brought under Title VII and M.G.L. c. 151B to survive summary judgment, courts have required that there must be "compentent evidence" that the alleged retaliator was aware of the plaintiff employee's protected activity. *See, e.g, Lewis v. Gillette Co.*, 22 F.3d 22, 24 (1st Cir. 1994); *Cathey v. Fallon Clinic, Inc.,* 2001 WL 801638 at *5 (Mass. Super. Ct.). *A copy of the Cathey case is attached as Exhibit A.* In *Lewis*, the First Circuit upheld the granting of summary judgment on a plaintiff's retaliation claim where the plaintiff was unable to establish that the individuals accused of retaliation were aware of his protected activity. *Lewis*, 22 F.3d at 25. Similarly, in disability discrimination cases, it is well-settled that if an individual responsible for the decision to terminate an employer is unaware of a plaintiff's disability, the employer cannot be found to have discharged the plaintiff "because of" the employee's handicap. *See Mazzarella v. United States Postal Service,* 849 F. Supp. 89, 96-97 (D. Mass. 1994)(no unlawful discrimination where the supervisor had no knowledge of the plaintiff's impairment prior to termination). Although no reported Massachusetts decision has addressed the knowledge requirement in a wrongful termination in violation of public policy case, courts in other jurisdictions have specifically found that a plaintiff must show that the decision maker had actual knowledge of the reported public policy violation by the plaintiff in order to survive summary judgment. *See e.g.,  Adams v. Kmart Corp*., 200 WL 969049 (N.D. Cal. 2001). *A copy of the Adams case is attached as Exhibit B.*

The reasoning supporting these retaliation and disability discrimination cases resonate with the present case. Plaintiff admitted at his deposition that he had no knowledge that Robert Murphy or Christopher Bergeron had disclosed his report of suspicious customer behavior to anyone else within Home Depot. (*Rule 56 Statement at ¶ 14*). Christopher Bergeron testified that he did not disclose the Plaintiff's report to anyone within Home Depot. (*Rule 56 Statement at ¶*

6

*15*).  More importantly, the two decision makers have both testified that they were wholly

unaware of Plaintiff's report of suspicious customer conduct when they made the decision to

terminate.  Chris Hoban testified at his deposition that he did not learn of Plaintiff's report of

suspicious customer conduct until **after** Plaintiff's termination and that the sole reason why he

recommended Plaintiff's termination was because of Mr. Quinn's operation of the forklift on

December 26, 2003 in violation of Home Depot's safety standards and his belief that this

violation followed on the heels of a previous safety violation by Plaintiff only a few months

earlier[3].  *(Rule 56 Statement at ¶ 28).*   Store Manager Peter McNamara has testified that he had

absolutely no knowledge or information about Plaintiff's earlier report of a suspicious interaction

with a customer when he approved Mr. Hoban's recommendation for termination and that he

approved the termination decision based solely on his belief that Mr. Quinn had two safety

violations in a relatively short period of time (*Rule 56 Statement at ¶¶ 28 and 29*).  Since neither

Mr. Hoban nor Mr. McNamara knew of Plaintiff's report to Mr. Murphy and Mr. Bergeron about

his conversation with the customer that he found to be suspicious when they made the

recommendation and decision to terminate, respectively, Plaintiff's wrongful termination in

violation of public policy claim must fail as a matter of law.

### D.    Plaintiff's Termination Was For A Legitimate, Non-Retaliatory Reason

Beyond the fundamental legal infirmity of plaintiff's claims as set forth above, the record

is otherwise undisputed that Mr. Quinn was terminated for legitimate reasons and not in

retaliation for making a statement about a suspicious customer.  The record evidence shows that

---

[3]      That Mr. Quinn disputes that his actions on September 18, 2003 amounted to a violation of Home Depot's
safety standards is not material to this matter.  What is material is that Mr. Hoban and Mr. McNamara **believed** that
Mr. Quinn had violated Home Depot's safety standards in September, was spoken to about it and then had another
safety violation a short time later.  *Johnson v. Center Operating Co., L.P.*, 2005 WL 910588 (N.D. Tx. 2005)(issue is

Mr. Hoban and Mr. McNamara understood that Mr. Quinn had engaged in two safety violations in a fairly short period of time[4]. Although he quibbles that the first safety violation did not in fact violate Home Depot's safety standards, Mr. Quinn himself *admits* to the second safety violation. Where Home Depot's code of conduct specifically states that these safety violations are major work rule violations that will result in termination of employment, *see Rule 56 Statement, at ¶ 5,* Mr. Quinn is hard-pressed to suggest to the Court that his termination was not for legitimate, non retaliatory reasons. In light of these irrefutable facts and where the record is absolutely devoid of evidence to suggest that Home Depot management was motivated to retaliate against Mr. Quinn because he was a "whistleblower," the Court must grant Home Depot's motion and dismiss this action.

## IV.    Conclusion

For the reasons set forth herein, Defendant Home Depot requests that its Motion be granted, that Plaintiff's claim against it be dismissed with prejudice, and for such other and further relief as the Court deems appropriate.

Respectfully submitted,

HOME DEPOT, U.S.A., INC.,

By its attorneys,

/s/ Allison Romantz
Robert P. Joy
Allison K. Romantz

---

not whether plaintiff employee was guilty of theft but whether employer had a good faith belief that he was.); *Jones v. Flagship Inter.,* 793 F.2d 714, 729 (5th Cir. 1986)(same).

[4]    Mr. Hoban has testified that his recommendation to terminate was based solely on Mr. Quinn's operation of the forklift on December 26, 2003 in violation of Home Depot's safety standards and his belief that this violation followed on the heels of a previous safety violation by Plaintiff only a few months earlier. *(Rule 56 Statement, at ¶28).*

8

MORGAN, BROWN & JOY, LLP
200 State Street
Boston, MA 02109
(617) 523-6666

### RULE 7.1(A)(2) CERTIFICATION

I hereby certify that pursuant to Local Rule 7.1(A)(2) that on February , 2006, I have conferred with counsel for the plaintiff, Paul F. Wood, Esq., Law Office of Paul Wood, 45 Bowdoin Street, Boston, MA to attempt in good faith to resolve or narrow the issues contained in this motion, but have been unsuccessful in doing so.

/s/ Allison K. Romantz
Allison K. Romantz


### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 16, 2006.

/s/ Allison K. Romantz
Allison K. Romantz

9

EXHIBIT A

Westlaw.

Not Reported in N.E.2d                                                                 Page 1
Not Reported in N.E.2d, 13 Mass.L.Rptr. 325, 2001 WL 801638 (Mass.Super.)
(Cite as: 2001 WL 801638 (Mass.Super.))

C

Massachusetts Superior Court.
Robert L. CATHEY
v.
FALLON CLINIC, INC.
No. CIV.A 97-00988A.

July 2, 2001.

SUMMARY JUDGMENT M.R.C.P. 56
*1 This action came on to be heard before the Court,
James P Donohue, Justice, presiding, upon motion of
the defendant(s), Fallon Clinic Inc, for Summary
Judgment pursuant to Mass. R. Civ. P. 56-the parties
having been heard--and the Court having considered
the pleadings and affidavits, finds there is no genuine
issue as to material fact and that the defendant is
entitled to a judgment as a matter of law,

Sara Goldsmith Schwartz, William E. Hannum III,
Dyana Tull, Schwartz, Hannum, P.C., Andover, for
Fallon Clinic, Inc.

John F. Hurley, MacCarthy, Pojani & Hurley, LLP,
Worcester, for Robert L. Cathey.

It is ORDERED and ADJUDGED:

That the Complaint of the Plaintiff(s), Robert L
Cathey be and hereby is DISMISSED against the
Defendant(s), Fallon Clinic Inc, with costs.

NOTICE OF DOCKET ENTRY
You are hereby notified that on 07/03/2001 the
following entry was made on the above referenced
docket:

MEMORANDUM of Decision and Order on
Defendant's Motion for summary judgment. ORDER:
For the foregoing reasons, summary judgment will
Enter for the defendant as to both claims.
(Donohue,J.) Entered and copies mailed 7/3/01

MEMORANDUM OF DECISION AND ORDER
ON DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

DONOHUE, Justice.

On June 18, 2001, this civil matter was before the
court for hearing on the motion of the defendant,

Fallon Clinic, Inc., ("Fallon") for summary judgment.
See Mass. R. Civ. P. 56. Plaintiff Robert L. Cathey
("Cathey"), a former Fallon employee, filed this
action alleging that (1) Fallon discriminated against
him on the basis of age in violation of M.G.L. c.
151B, § 4(1) when it eliminated his position in
October of 1995, and (2) Fallon retaliated against him
by withdrawing its severance offer because he filed
claims against Fallon with the Massachusetts
Commission Against Discrimination ("MCAD"). In
its motion, Fallon argues that it is entitled to
summary judgment as to both of Cathey's claims,
because (1) Cathey's age discrimination claim is
preempted in its entirety by the Employee Retirement
Income Security Act, 29 U.S.C. § 1001 et seq
("ERISA"), and because (2) Fallon's failure to pay
Cathey severance benefits did not constitute
retaliatory conduct. In his opposition to the motion
for summary judgment, Cathey argues to the
contrary. For the reasons stated below, summary
judgment will ENTER for the defendant.

STATEMENT OF THE CASE
The following facts are undisputed in the summary
judgment record:

From 1979 to 1995, plaintiff Robert L. Cathey was
employed by the defendant, Fallon Clinic, Inc., in the
position of Controller. Cathey was an at-will
employee. His responsibilities involved, among other
things, the area of pensions, malpractice insurance,
and documentation of the company's financial
position. On October 1, 1995, Cathey was terminated
from his position at Fallon Clinic, and was told that
the reason was Fallon Health Care System's need to
decrease its expenses. As of October 1, 1995,
Cathey's salary was approximately $95,000.00 per
year, and he was sixty-three years of age. Cathey's
position was later filled by the assistant controller.

Cathey received a letter from Fallon on October 3,
1995, offering him severance benefits pursuant to
certain conditions. [FN1] The letter stated, in relevant
part, that Cathey's receipt of severance benefits was
conditioned upon certain terms, including his
agreement not to seek legal action against Fallon as
to his termination, and his signing of the letter within
forty-five days. Cathey and Fallon discussed the
terms of the severance offer, and on November 3,
1995, Cathey received a slightly revised version of
the October 3, 1995 letter. The November 3, 1995

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 13 Mass.L.Rptr. 325, 2001 WL 801638 (Mass.Super.)
(Cite as: 2001 WL 801638 (Mass.Super.))

Page 2

letter retained the same timeline stated in the October 3, 1995 letter. On December 13, 1995, Cathey's attorney informed Fallon that Cathey had refused to sign the agreement letter, and had filed a claim with the MCAD. Fallon subsequently withdrew its severance offer.

> FN1. Although the first agreement was set out in the October 3, 1995 letter, the November 3, 1995 letter is at issue in the instant case.

## DISCUSSION

*2 Summary judgment shall be granted where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. _Cassesso v. Commissioner of Correction,_ 390 Mass. 419, 422, 456 N.E.2d 1123 (1983); _Community National Bank v. Dawes,_ 369 Mass. 550, 553, 340 N.E.2d 877 (1976); Mass. R. Civ. P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the moving party is entitled to judgment as a matter of law. _Pederson v. Time, Inc.,_ 404 Mass. 14, 16-17, 532 N.E.2d 1211 (1989). Where the party moving for summary judgment does not have the burden of proof at trial, this burden may be met either by submitting affirmative evidence that negates an essential element of the opponent's case or "by demonstrating that proof of that element is unlikely to be forthcoming at trial." _Flesner v. Technical Communications Corp.,_ 410 Mass. 805, 809, 575 N.E.2d 1107 (1991); _Kourouvacilis v. General Motors Corp.,_ 410 Mass. 706, 716, 575 N.E.2d 734 (1991). Once the moving party establishes the absence of triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a material fact in order to defeat the motion. _Pederson,_ supra at 17, 532 N.E.2d 1211.

In opposition to Fallon's motion for summary judgment, Cathey has submitted legal memoranda and the affidavit of Robert Cathey. The issues presented are (1) whether Cathey's age discrimination claim is preempted by ERISA, and (2) whether Fallon's withdrawal of the severance offer constituted retaliation in violation of M.G.L. c. 151B, § 4.

I. Cathey's age discrimination claim is preempted in its entirety by ERISA because the existence of an ERISA pension plan is a critical factor in establishing liability

Cathey claims that although his employment at Fallon was at-will and thus terminable by either himself or by Fallon at any time and for any reason, he is protected under state law pursuant to M.G.L. 151B, § 4(1) because his discharge was motivated by age discrimination. _See Jackson v. Action for Boston Comm. Development, Inc.,_ 403 Mass. 8, 9, 525 N.E.2d 411 (1988). Fallon argues that it is entitled to summary judgment as to Cathey's claim of age discrimination because the claim is preempted by ERISA. [FN2] Cathey contends that ERISA does not bar his claim and that, although he alleged in his deposition that Fallon had pension-defeating motives in terminating him, and although he alleged in his complaint and in his deposition that he seeks damages pursuant to loss of his pension plan benefits, Cathey now asserts that he is not seeking to recover pension benefits or to prove that Fallon terminated him to avoid its pension obligations to him. See Memorandum in Opposition to Defendant's Motion for Summary Judgment, at 11.

> FN2. Fallon also argues that Cathey's age discrimination claim must fail because he cannot establish a prima facie case of age discrimination and because he cannot demonstrate that his position was eliminated because of his age, i.e., that Fallon's legitimate non-discriminatory reasons for eliminating his position were a pretext for age discrimination. Fallon asserts that it had implemented a reduction-in-force in late 1995 due to financial problems and industry pressure to decrease medical costs without sacrificing quality of care. Fallon stated that Cathey's position was included in the reduction-in-force because (1) Cathey performed administrative tasks that were not directly relevant to the operations of Fallon; (2) Cathey was less efficient than his co-workers in performing duties and responsibilities; (3) these duties were easily absorbed by Cathey's co-workers; (4) Fallon thus could not justify Cathey's high salary. See Memorandum of Law in Support of Fallon Clinic, Inc.'s Motion for Summary Judgment, at 2. Because, however, the evidence in the record supports an entry of summary judgment for Fallon on other grounds, this Court need not address those arguments.

The Supreme Court has established that a plaintiff's state law claim claim that his employer terminated him to avoid pension obligations is a claim seeking to enforce a right protected under ERISA § 510, and is therefore preempted by ERISA § 502(a). [FN3] See

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                    Page 3
Not Reported in N.E.2d, 13 Mass.L.Rptr. 325, 2001 WL 801638 (Mass.Super.)
(Cite as: 2001 WL 801638 (Mass.Super.))

*Ingersoll-Rand v. McClendon*, 498 U.S. 133, 144, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990) (where discharged employee filed suit in state court alleging employer's reduction-in-force was motivated by desire to avoid pension obligations, court held that the claim was preempted by federal law because it fell squarely under ERISA § 510 and was therefore subject only to the enforcement scheme set out in ERISA § 502(a)). See also *Treadwell v. John Hancock Mut. Life Ins. Co.,* 666 F.Supp. 278, 282-283 (D.Mass.1987) (ERISA preempted wrongful discharge claim where plaintiff alleged that employer forced him to retire early to deny him pension benefits); see also *St. Arnaud v. Chapdelaine Truck Center, Inc.,* 836 F.Supp. 41, 43 (D.Mass.1993.)

> FN3. ERISA § 502(a) provides the following: "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan ..." 29 U.S.C. § 1140. See also *Ingersoll-Rand,* supra, at 142-143.

*3 Additionally, state law claims that are not directly implicated under the language of ERISA might nevertheless be preempted by federal law when brought under a cause of action governed by ERISA. The Supreme Court has found that where "the existence of a pension plan is a critical factor in establishing liability under the [s]tate's wrongful discharge law," the cause of action can relate "not merely to pension benefits, but to the essence of the pension plan itself." *Ingersoll-Rand* at 139-140 (court found that even though plaintiff did not seek pension plan benefits, ERISA preempted claims that were based on employer's improper pension-defeating motives.) See also *Fairneny v. Savogran Company,* 422 Mass. 469, 476, 664 N.E.2d 5 (1996) (court found ERISA preempted plaintiff's state law -based defamation claims where conduct giving rise to claims was linked to terms of an ERISA plan, because trial of the claims would inevitably have involved testimony regarding the plan provisions.) Accordingly, where a cause of action "makes specific reference to, and indeed is premised on, the existence of a pension plan," and the cause of action "does not focus on [the additional claims] but rather on the employer's termination decision," that cause of action is preempted by ERISA and the claims related to it

may be preempted as well. *Id .* at 140, 141, 664 N.E.2d 5.

In this case, ERISA preempts Cathey's age discrimination claim in its entirety because the summary judgment record shows that the heart of the claim is based on Cathey's allegation that Fallon discharged him at age sixty-three primarily to reduce its pension obligations to him. In his complaint, Cathey claims, among other things, that he is entitled to damages representing "the difference between the pension benefits the plaintiff would have received if his employment continued until age 65 and the pension benefits he will receive because his employment stopped at age 63 which difference in pension benefits must be multiplied by the plaintiff's life expectancy." See Pl's Complt., ¶ 11. Additionally, during a deposition, Cathey testified as follows:

Q: Let me go back to why you believe, sitting here today, you were included in this layoff. You mentioned age. Do you also contend that the reason had anything to do with your pension benefits at Fallon Clinic?

A: Yes.

...

Q: So it's your contention that Fallon Clinic terminated your employment in October of 1995 so that it could avoid having to make further contributions to your pension?

A: That's correct.

...

Q: Is it your belief that Fallon Clinic was aware of how much pension benefit or pension costs they could avoid by terminating your employment in October, 1995, and that's the reason why they did so?

A: I believe -

MR. HURLEY: Objection.

A: I believe that they could have been aware of that and that it was one element in my termination.

...

Q: Okay. And your decision to bring this lawsuit was in part to recover the pension benefits that you otherwise would have been entitled to if you had continued your employment at Fallon Clinic?

*4 A: Yes, that was denied me, yes.

See Fallon Clinic, Inc.'s Appendix--Volume II, Cathey Dep. at 454, dated September 29, 1998.

In light of the evidence in the summary judgment record, this Court does not agree with the contention the plaintiff now asserts in his opposition, namely that his age discrimination claim is not preempted by ERISA because he is not seeking to recover his

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 13 Mass.L.Rptr. 325, 2001 WL 801638 (Mass.Super.)
(Cite as: 2001 WL 801638 (Mass.Super.))

Page 4

pension benefits or to prove that Fallon's primary purpose in terminating him was to reduce its pension obligations. See, e.g., *Ingersoll-Rand* at 145 ("[I]t is no answer to a pre-emption argument that a particular plaintiff is not seeking recovery of pension benefits.") The record shows that Cathey's age discrimination claim is based in large part on his allegation that Fallon was improperly motivated to discharge him two years before he was due to retire in order to avoid paying his full pension benefits. Thus, the existence of Fallon's pension plan will likely be a critical factor at a trial on the merits in establishing liability as to all of the allegations Cathey has enumerated under his age discrimination claim, namely loss of pension benefits, loss of income, loss of fringe benefits, [FN4] the cost of continuing his life insurance policy until his sixty-fifth birthday, and emotional distress. See Pl's Complt. at ¶ ¶ 4-6. Thus, Cathey's age discrimination claim, which includes the allegations discussed *supra,* is preempted by ERISA in its entirety, and cannot be tried in state court.

> FN4. Cathey's complaint describes these benefits as Fallon's contributions to the payment of accident and health insurance premiums.

I. Cathey's retaliation claim fails because he failed to exhaust his administrative remedies and has failed to establish a prima facie case of retaliation

In his complaint, Cathey alleges that Fallon retaliated against him in violation of M.G.L. c. 151B by failing to pay him benefits due under a severance agreement because Cathey filed a complaint against Fallon with the MCAD. Cathey also alleges, in his complaint, that Fallon violated M.G.L. c. 151B § 4 by conditioning his receipt of severance benefits on an agreement to release any potential claims he might have against Fallon. In its motion, Fallon argues that it is entitled to summary judgment as to these claims because Cathey failed to exhaust his administrative remedies, because conditioning the severance agreement on a release of claims does not violate M.G.L. c. 151B § 4, and because Cathey has not established a prima facie case showing that Fallon's conduct constituted retaliation. Cathey has articulated a retaliation claim only in his complaint, and has thus failed to rebut, Fallon's arguments for summary judgment regarding the retaliation claim. [FN5]

> FN5. Fallon points out that under Mass. R. Civ. P. Rule 56(e), "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party

may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing there is a genuine issue for trial. If he does not so respond, summary judgment, is appropriate, shall be entered against him." Since, however, Cathey's complaint references evidence submitted in support of his retaliation claim, this Court will analyze the claim on its merits.

Cathey's retaliation claim fails because he failed to exhaust his administrative remedies by not filing a timely administrative charge alleging retaliation. A plaintiff is required to exhaust his administrative remedies by filing a charge with the MCAD before pursuing a claim in court. See M.G.L. c. 151B, § § 5-9. MCAD regulations require complainants to include the following in an MCAD charge: "appropriate identification of the complainant(s) and the person(s) alleged to have committed the unlawful discriminatory acts; ... the date(s) on which such unlawful discriminatory acts occurred; ... and a concise statement of the alleged discriminatory acts." 804 C.M.R. § 1.03(4). Discrimination claims are generally dismissed where the complaint filed in court exceed the scope of the charges set out in the MCAD charge. See *Riebold v. Eastern Casualty Ins. Co., Inc.,* 1997 WL 311523, at 3-4 (Mass. Sup.Ct. June 4, 1997) (court dismissed sex discrimination claim where plaintiff failed to articulate particulars in support of her claim in MCAD charge); *Conroy v. Boston Edison Co.,* 758 F.Supp. 54, 60 (D.Mass.1991) (court found allegations of new acts of discrimination were inappropriate where complainant failed to allege these acts in MCAD complaint); *Cogen v. Milton Bradley Co.,* 1989 WL 81067, at 5 (D. Mass. Jan 12, 1989) (court dismissed hostile environment claim where administrative charge claimed only disparate treatment.)

*5 In this case, Cathey set out only the following discrimination claim in his MCAD charge:
> The Complainant is 63 years of age and has been employed by Fallon Clinic, Inc. for approximately 16 years and was entitled to commence reciving full pension benefits upon attaining the age of 65. Fallon Clinic, Inc., however, notwithstanding the above, saw fit to discharge the complainant by letter to the complainant dated October 1, 1995 wherein it stated that his position as Controller/Director of Finance had been eliminated effective October 1, 1995.
See Fallon Clinic, Inc.'s Appendix--Volume I, Exh.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                 Page 5
Not Reported in N.E.2d, 13 Mass.L.Rptr. 325, 2001 WL 801638 (Mass.Super.)
(Cite as: 2001 WL 801638 (Mass.Super.))

13, MCAD Complaint.

The evidence in the summary judgment record shows that Cathey filed a charge with the MCAD with respect to his age discrimination claim, but he failed to file a charge alleging retaliation and he did not amend his MCAD charge before filing suit in court. Because he did not raise retaliation as a cause of action in his MCAD charge, Cathey failed to exhaust his administrative remedies pursuant to M.G.L. c. 151B and cannot now pursue a retaliation claim in this court.

Cathey's retaliation claim also fails because he has not demonstrated a prima facie case of retaliation. Under M.G.L. c. 151B, an employer is prohibited from retaliating against an employee because that employee filed a complaint, testified or assisted in an MCAD or court proceeding. G.L. c. 151B, § § 4(4), 4(4A). To recover on a retaliatory discharge claim under 151B, a plaintiff must establish that (1) he engaged in a protected activity by filing a complaint, testifying or assisting in an MCAD or court proceeding; (2) the defendant employer was aware of that protected activity; (3) the defendant thereafter took an adverse employment action against the plaintiff; and (4) but for the plaintiff's activity, the defendant would not have taken the adverse employment action against him. See _MacCormack v. Boston Edison Co., 423 Mass. 652, 662-63, 672 N.E.2d 1 (1996);_ see also _Ruffino v. State Street Bank & Trust Co., 908 F.Supp. 1019, 1044 (D.Mass.1995)_ (analyzing state law claim). At a minimum, there must be competent evidence that the alleged retaliator knew of the plaintiff's protected activity and that a retaliatory motive played a part in the adverse employment action alleged. _Lewis v. Gilette Co., 22 F.3d 22, 24 (1 st Cir.1994)._

Here, it is undisputed that Cathey exercised his rights under M.G .L. c. 151B and that Fallon was aware of his claim. The question, therefore, is whether Fallon's conduct was an adverse employment decision, and whether it was causally related to the filing of Cathey's MCAD complaint. In this case, the evidence does not show that Fallon's withdrawal of the severance offer constituted an adverse employment action. Nor does the evidence show that but for the exercise of his rights under M.G.L. c. 151B, Cathey would not have suffered the loss of those severance benefits. As more fully discussed below, Cathey has failed to meet his burden under the third and fourth prongs of this test.

*6 Cathey has not established, under the third prong

of the test, that he was subjected to an adverse employment action decision pursuant to M.G.L. c. 151B(4). This Court does not agree with Cathey's contention that Fallon's "conditioning the payment of additional benefits on the abstention of the plaintiff from seeking to enforce any right he might enjoy under the provisions of [M.G.L. c. 151B, §. 4], is a clear violation of said section ..." [FN6] See Pl's Complt., ¶ 9. Cathey has not cited to any authority that supports such a finding, or even referenced this allegation in his opposition. In fact, an employer's conditioning of an offer of severance benefits upon a discharged employee's release of claims against the employer has been upheld as valid. See, e.g., _Smith v. Fallon Clinic, Inc., 1998 WL 296900 at 3-6 (Mass. Sup.Ct. June 3, 1998)_ (court dismissed complaint because plaintiff signed release of all claims as a condition of receiving Fallon's offer of severance benefits.)

> FN6. The November 3, 1995 severance agreement letter provides the following:
> "In exchange for the special severance package offered to you under this Agreement, to which, you agree, you were not otherwise entitled, you hereby release and forever discharge the Company ... from any and all causes of action, rights, or claims that you have had in the past, now have or might now have, in any way related to, arising out of or connected with your employment and its termination or pursuant to any federal, state or local employment laws, regulations, or other requirements, including but not limited to Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Age Discrimination in Employment Act and the Massachusetts fair employment practices statute ..." Def.'s Appendix Volume I, Exh. 10.

Furthermore, Cathey has failed to satisfy the fourth prong of the test, that is, he has not established that but for the exercise of his rights under M.G.L. c. 151B, Fallon would not have withdrawn his severance benefits. The evidence in the summary judgment record shows that the withdrawal of the severance offer after Cathey's filing of charges with the MCAD was not the type of causal connection that establishes retaliation as contemplated by M.G.L. c. 151B. The November 3, 1995 letter provided that Cathey was to sign the agreement provided therein in order to receive the severance benefits offered. Def.'s Appendix Volume I, Exh. 10. Additionally, the record shows that Cathey recognized that he was not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 13 Mass.L.Rptr. 325, 2001 WL 801638 (Mass.Super.)
**(Cite as: 2001 WL 801638 (Mass.Super.))**

Page 6

entitled to receive the benefits if he refused to sign the agreement. He testified as to the following at his deposition:

> Q: So you understood that if you declined the severance agreement, you wouldn't receive the benefits of the severance agreement. Is that right?
> A: Yes.

See Fallon Clinic, Inc.'s Appendix--Volume III, Cathey Dep. at 454, dated April 25, 2000.

Since Cathey voluntarily refused to sign the agreement, he cannot claim that he was entitled to receive the benefits offered. The offer was expressly conditioned on his signing of the agreement as well as on his release of claims pursuant to signing the agreement, and because Cathey subsequently refused to sign the agreement, his claim that filing an MCAD complaint triggered the withdrawal of the offer fails. Moreover, Fallon's withdrawal of the severance offer in accordance with the express conditions of the severance agreement shows no evidence of retaliatory conduct on Fallon's part. Thus, Cathey has not demonstrated that there was an improper causal connection between his filing of an MCAD charge and the loss of the severance benefits, as required under M.G.L. c. 151B.

For the reasons discussed above, summary judgment will *ENTER* for Fallon as to the retaliation claim, as is provided by <u>Mass. R. Civ. P. Rule 56(e)</u>.

### ORDER

*7 For the foregoing reasons, summary judgment will *ENTER* for the defendant as to both claims.

Not Reported in N.E.2d, 13 Mass.L.Rptr. 325, 2001 WL 801638 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT B

Not Reported in F.Supp.2d, 2001 WL 969049 (N.D.Cal.)

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, N.D. California.
Dennis ADAMS, Plaintiff,
v.
KMART CORPORATION, Defendant.
No. C 00-03885 WHA.
Aug. 10, 2001.

ORDER GRANTING DEFENDANT KMART'S MOTION FOR SUMMARY JUDGMENT

ALSUP, J.

INTRODUCTION

***1** In this wrongful-termination case, this order GRANTS defendant's motion for summary judgment. The main reason is that the record fails to allow even the inference that plaintiff's termination was in retaliation for reporting violations of a public policy.

STATEMENT

Plaintiff Dennis Adams began working for defendant Kmart Corporation in November of 1997. In September of 1999, he was transferred from Southern California to Oakland and promoted to the position of grocery manager. His immediate supervisor in Oakland was Michael Barter, Assistant Store Director, Food. On April 10, 2000, plaintiff received a favorable performance evaluation from Mr. Barter's superior, Randy Bronson, Store Director. Six days later, however, Mr. Bronson gave plaintiff a written reprimand for failing to show up to work without calling. The reprimand stated: "Dennis, on 4/15 you were scheduled to work and you did not show, nor did you call. This is unacceptable & will not be tolerated. Any future disregard for company policy will result in your termination" (Adams Dep., Exh. 13). At his deposition, plaintiff did not remember that the warning stated that any future disregard for company policy would result in his termination (Adams Dep. 78). In May of 2000, plaintiff was promoted to Assistant Store Director, Food, and Mr. Barter was promoted to Co-Store Director. At all times, plaintiff was an at-will employee.

Mr. Bronson states that on June 29, 2000, he terminated plaintiff for being inexcusably absent from work without calling in (Bronson Decl. ¶¶ 6-7). Although plaintiff had been scheduled to work until 5:00 p.m. on Monday June 26, plaintiff left work at 1:00 p.m., according to Mr. Barter (Barter Decl. ¶ 4). On Tuesday June 27, Mr. Barter states, he counseled plaintiff for leaving early (*ibid.*). Later on Tuesday June 27, in Mr. Barter's account, plaintiff left work around noon to pick up some badges (*ibid.*). According to Mr. Barter, plaintiff did not return from picking up the badges and instead called Mr. Barter and stated that he was delayed on the bridge and would come in later (*ibid.*). Plaintiff did not return to work on Tuesday June 27. According to Mr. Barter, plaintiff was scheduled to work until 5:00 p.m. (*ibid.*). On Wednesday June 28, Mr. Barter states, plaintiff did not show up until 2 p.m., when he was scheduled to arrive at 7 a.m. (*ibid.*).

Plaintiff recounts a different version of these events. According to him, he left work on June 26 to pick up some badges, but he returned to work afterward (Adams Dep. 140). The next day, he left work around 1:30 p.m., but this was because Mr. Bronson had only scheduled him to work a half-shift that day, from 7 a.m. to 12 p.m. (*id.* at 143). Mr. Barter called him around 5:00 p.m. that evening when he was on the San Mateo Bridge and asked him to return to work, to which he replied, "I'll try to make it back there if I can" (*id.* at 144). He did not return, however (*id.* at 147). The next day, he did not come to work until 2 p.m., because "I knew I would be working from 9:00 in the evening until the early morning hours on Thursday, and that I would have to be working eleven days in a row before my next day off" (Adams Decl. ¶ 5). According to him, he had planned to work late on Wednesday night with co-worker Paul Wong and had made these plans in Mr. Barter's presence on Friday June 23 when he, Mr. Wong, and Mr. Barter were taking a cigarette break (Adams Dep. 149). He did not call in on Wednesday morning because from the conversation in the parking lot, Mr. Barter knew he

would be at work late (*id.* at 150).

**\*2** Plaintiff maintains that he was terminated in retaliation for reporting to Mr. Barter that a meat manager, Sergio Sanchez, had re-labeled meat that was no longer fresh and had tired to re-grind old hamburger meat, and for reporting to loss control that Mr. Sanchez and Mr. Barter were padding their inventory. In his deposition, plaintiff testified that before he was promoted, in around late April or early May of 2000, at around 2 a.m., he saw Mr. Sanchez re-wrapping chicken (Adams Dep. 102). He witnessed that Mr. Sanchez "took expired chicken and redated it with a different date," extending the sell-by-date for the chicken beyond when it could be legally sold (*id.* at 105). According to plaintiff, he told Mr. Barter about this, and Mr. Barter stated "I'll take care of it" (*id.* at 106). Plaintiff testified that on a separate occasion, although the date is unclear, he told Mr. Barter that Mr. Sanchez was going to re-grind hamburger that was out-of-date, but that Mr. Sanchez was stopped before this occurred (*id.* at 134-35).

On yet another occasion, according to plaintiff, he reported to Mr. Barter that he had observed Mr. Sanchez throwing out chicken that Mr. Sanchez had overstocked (*id.* at 120). Again, Mr. Barter allegedly stated that he would take care of this (*ibid.*). Plaintiff further testified that in early June of 1999, he told Steve Cabrera, the loss control manager, that Mr. Sanchez had overestimated the amount of chicken lost when a freezer was turned off and that he suspected that Mr. Barter and Mr. Sanchez were "padding" their inventories (*id.* at 128). Inventory padding, plaintiff states, is when a manager overstates the amount of his or her inventory in order to decrease the disparity between inventory and gross sales to make his or her "numbers look a little bit better" (*id.* at 129-31). This, in turn, allows a manager to obtain a bigger bonus, according to plaintiff (Adams Decl. ¶ 6).

\* \* \*

On September 5, 2000, plaintiff filed suit against Mr. Barter and Kmart in Alameda Superior Court, alleging six causes of action: (i) breach of contract; (ii) breach of the implied covenant of good faith and fair dealing; (iii) violation of public policy; (iv) intentional infliction of emotional distress; (v) negligent infliction of emotional distress; and (vi) retaliation. Kmart then removed the action based on diversity of citizenship. Shortly thereafter, Mr. Barter was dismissed as a defendant. Kmart, the only remaining defendant, now seeks summary judgment on all causes of action. Plaintiff has filed a non-opposition to summary judgment on his causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing. Summary judgment is therefore granted as to those two causes of action. The others are addressed in turn.

ANALYSIS

Summary judgment is granted when no genuine issue of material fact exists, and no reasonable trier of fact could find other than for the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The moving party has the initial burden of production. It may carry this burden in either of two ways: it may offer evidence disproving an element of the plaintiff's case, or it may show the absence of any genuine issue of material fact. *Id.* at 323. Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 323-324 (internal quotations omitted).

Tortious Discharge in Violation of Public Policy

**\*3** The complaint sets forth "violation of public policy" and "retaliation" as separate causes of action. While these claims are listed as distinct, there is no evidence that plaintiff has engaged in any activity protected by civil-rights laws or pursued, much less exhausted, administrative remedies for filing a retaliation claim pursuant to the California Fair Employment and Housing Act, California Government Code 12940 et seq. *Okoli v. Lockheed Technical Operations Co.*, 36 Cal.App. 4th 1607, 1613-14 (1995). The Court thus construes both of these claims together as one single cause of action for tortious discharge in violation of public policy.

Plaintiff's tortious-discharge claim is based on the theory that he was terminated for reporting that Mr. Sanchez was re-labeling out-of-date meat and attempting to re-grind out-of-date hamburger, for reporting that Mr. Sanchez and Mr. Barter were padding their inventory, or for both. Only his contention that he was terminated for informing management about the resale of outdated food states a claim for tortious discharge. "A tortious discharge claim requires that the employee be discharged in violation of a policy that is: (1) delineated in either constitutional or statutory provisions; (2) public in the sense that it inures to the benefit of the public rather than serving merely the interests of the individual; (3) well established at the time of the discharge; and (4) substantial and fundamental." *Sullivan v. Delta Airlines, Inc.*, 58 Cal.App. 4th 938, 943 (1997) (quotations omitted). Preventing the sale of outdated food is a fundamental public policy protecting the health

and safety of the public, and it is prohibited by clear statutory provisions that have existed for some time. *E.g* ., Cal.Penal Code 383. [FN1] In contrast, preventing inventory padding is not a clear or fundamental public policy. Such a policy does not significantly benefit the public at large. Rather, it simply affects Kmart. As the California Supreme Court recently explained, termination for reporting acts such as inventory padding does not amount to a discharge in violation of public policy:

> FN1. The statute provides in part: "Every person who knowingly sells, or keeps or offers for sale, or otherwise disposes of any article of food, drink, drug, or medicine, knowing that the same is adulterated or has become tainted, decayed, spoiled, or otherwise unwholesome or unfit to be eaten or drunk, with intent to permit the same to be eaten or drunk, is guilty of a misdemeanor."

violations of internal practices that affect only the employer's or employee's interest, and not the general public's interest, will not give rise to tort damages. In other words, courts must focus not on compensation to employees, but rather on the general social policies being advanced. Even then, not all statutes (or constitutional provisions) will support a *Tameny* claim. Many statutes simply regulate conduct between private individuals, or impose requirements whose fulfillment does not implicate fundamental public policy concerns.
*Green v. Raley Engineering Co.,* 19 Cal.4th 66, 75 (1998) (citing *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 669-70 (1988)) (quotations and brackets omitted). Plaintiff argues that *Collier v. Superior Court,* 228 Cal.App.3d 1117 (1991), supports his contention that inventory padding implicates a fundamental public policy. *Collier,* however, involved an employee who reported that other employees had "violated laws against bribery and kickbacks; embezzlement; tax evasion; and possibly even drug trafficking and money laundering," as well as antitrust law. *Id.* at 1122 (citations omitted). In contrast to the myriad of violations alleged in *Collier,* which as a whole substantially affected society at large, inventory padding merely affects the contractual relationship between Kmart and its management. It is not a public-policy violation.
**\*4** Under California law, a plaintiff bringing a tortious-discharge claim must prove that his or her termination was motivated by his or her report of a public-policy violation. *Turner v. Anheuser-Busch, Inc.,* 7 Cal.4th 1238, 1253, 1258 (1994). This case raises the legal question of what evidence is necessary for a trier of fact to find that the decisionmaker was motivated to fire plaintiff on account of his having reported a public-policy violation. This question, in turn, subdivides into two separate issues: whether the decisionmaker was aware of the report, and, if so, whether the decisionmaker stood to benefit from the retaliation or the public-policy violation.
No California decision expressly states that an employer's knowledge of an employee's whistleblowing is a required element of a tortious-discharge claim. In retaliation claims brought under Title VII and the FEHA, however, both the Ninth Circuit and California courts have held that the decisionmaker's knowledge of the protected activity is an essential element. *Cohen v. Fred Meyer, Inc.,* 686 F.2d 793, 796 (9th Cir.1982); *Morgan v. Regents of University of California,* 88 Cal.App. 4th 52, 69-70 (2000). [FN2] *Fred Meyer* resonates with the present case. In *Fred Meyer,* the plaintiff filed a discrimination complaint with the EEOC, alleging that her employer had engaged in a pattern and practice of discriminatory hiring and promotion. The EEOC relayed her complaint to the vice-president of the defendant, Fred Meyer. A few months later, Mr. Reynolds was hired as the district manager of the plaintiff's store. He devised a shift-rotation policy requiring the plaintiff to either take some weekend shifts, or to lose status and pay. Two months later, when the shift-rotation policy went into effect, the plaintiff complained to the EEOC representative handling her initial complaint. Thereafter, the EEOC representative called Mr. Reynolds, which was the first time he became aware that the plaintiff had lodged any complaints with the EEOC. The court held that the plaintiff had failed to establish a prima facie case of retaliation, because "at the time Reynolds made the decision that directly resulted in the adverse action against [plaintiff], he did not know that she had engaged in a protected activity. This breaks the requisite causal link between the decision to implement the policies and [plaintiff's] EEOC complaint." *Fred Meyer,* 686 F.2d at 797.

> FN2. Other circuits also require the decisionmaker to have knowledge of the protected activity. *Causey v. Balog,* 162 F.3d 795, 804 (4th

Cir.1998); _Raney v. Vinson Guard Serv. Inc.,_ 120 F.3d 1192, 1197 (11th Cir.1997); _Bartlik v. United States Dep't of Labor,_ 73 F.3d 100, 102 (6th Cir.1996).

Similarly, plaintiff has offered no direct evidence that Mr. Bronson was aware that he had reported a public-policy violation. In fact, the only direct evidence in the record is Mr. Bronson's denial that he was aware of any report by plaintiff (Bronson Decl. ¶¶ 2, 4). The Court accepts the possibility that knowledge can be proven through circumstantial evidence. For example, it _might_ have been shown that there was a standard operating procedure whereby Mr. Barter reported allegations regarding the sale of out-of-date food to Mr. Bronson. No proof of such a policy or practice exists in the record here. The most that can be said is that Mr. Barter was supervised by Mr. Bronson. It could be presumed that they would have various conversations regarding various, but not all, aspects of the business, but this is such weak circumstantial evidence that no reasonable trier of fact could rely upon it to defeat the clear-cut denial of knowledge by the decisionmaker.

**\*5** The Court has considered the possibility that Mr. Barter recommended the termination and was improperly motivated, even though Mr. Bronson was oblivious to the true reason for the recommendation. Plaintiff has cited no law that a company is liable for a bad-faith recommendation to terminate when the actual **decision maker** has no **knowledge** of the improper purpose behind the recommendation. Even assuming _arguendo_ that an alterative way to prove retaliation would be to show that the decisionmaker, while innocent, **terminated** an employee in reliance upon a recommendation by another manager within the company, who did have knowledge that the employee had reported a **public-policy** violation and who was motivated to **terminate** the employee on account of it, the record is still missing key evidence. Plaintiff's testimony is that Mr. Barter knew plaintiff had reported that Mr. Sanchez had re-labeled outdated chicken and attempted to re-grind old meat. But again, there is no proof that Mr. Barter recommended termination.

A further gap in proof concerns Mr. Bronson's and Mr. Barter's motivation. The company's policy, as even plaintiff admits, was to always sell fresh chicken and meat and to never sell outdated food (Adams Decl. ¶ 3). There is no evidence that either Mr. Barter or Mr. Bronson would have benefitted from the sale of outdated food. Plaintiff admits that as soon as he allegedly told Mr. Barter about Mr. Sanchez's attempt to re-grind hamburger, "it was stopped right there" (Adams Dep. 135). There is no evidence that either Mr. Barter or Mr. Bronson instructed Mr. Sanchez to re-label outdated chicken. There is no evidence that Mr. Sanchez thought he was acting in accordance with either Mr. Barter's or Mr. Bronson's wishes. Mr. Sanchez's deposition was not even taken. There is simply no nexus between the public-policy violations that plaintiff allegedly reported and any benefit to either Mr. Barter or Mr. Bronson. This failure of proof exists as to both direct and circumstantial evidence. Therefore, even if they were aware of plaintiff's report that Mr. Sanchez was violating the law, the present record shows no motivation on Mr. Barter's or Mr. Bronson's part to retaliate against plaintiff on account of his reporting this.

Plaintiff argues that the reasons given for his termination were a sham and a mere pretext. This is circumstantial evidence, he says, from which a trier of fact could reasonably conclude that the real reason for his termination was retaliation for reporting a violation of a fundamental public policy. Plaintiff cites _Reeves v. Sanderson Plumbing Products, Inc.,_ 530 U.S. 133, 147 (2000), for the proposition that a pretextual justification for termination is circumstantial evidence of discriminatory intent. _Reeves,_ however, involved discrimination, not retaliation. That decision did not confront the problem of whether the decisionmaker had to be aware of the age of the plaintiff, although presumably in most cases the approximate age of an employee is readily apparent. For purposes of this motion, the Court assumes (without deciding) that a pretextual reason for termination could be used as circumstantial evidence that the termination was motivated by a reason other than the stated reason. Construing the summary-judgment record in the manner most favorable to the plaintiff, as must be done on this motion, the Court agrees with plaintiff that the reasons given for his termination (three straight days of unwarranted partial absences) is subject to doubt. [FN3] And further, the Court assumes that the trier of fact could find that the reason given was a pretext for something else. It does not automatically follow, however, that the real reason was because he reported a public-policy violation. It could just as easily have been some other improper purpose - such as the alleged inventory padding. On this record, the circumstance of a pretextual reason lends very little weight to the idea that he was terminated in violation of public policy. Even taking into account the maximum plausible inferences from a pretextual termination, it would be impossible for a reasonable trier of fact

to disregard the affirmative evidence that the decisionmaker was in no way motivated by plaintiff reporting a public-policy violation. Accordingly, summary judgment in favor of Kmart is granted as to plaintiff's tortious-discharge claim.

> FN3. On Monday, plaintiff claims, he only left work for an hour and then returned. On Tuesday, according to plaintiff, he was only scheduled for a half day and then was unable to return to work after Mr. Barter called him around 5:00 p.m., requesting his presence. On Wednesday, Mr. Barter knew that he was going to work late and thus would come in late, plaintiff says. This issue is further complicated by the fact that Kmart lost the schedule book.

Emotional Distress

**\*6** Plaintiff's only argument in support of his causes of action for intentional and negligent infliction of emotional distress is based on the contention that his cause of action for tortious discharge is viable (Br.12). Without the existence of a tortious-discharge claim, plaintiff's emotional-distress claims are preempted by the Workers' Compensation scheme. *Cole v. Fair Oaks Fire Protection Dist., 43 Cal.3d 148, 160 (1987).* Kmart is therefore entitled to summary judgment on these two claims as well.

CONCLUSION

Defendant's motion for summary judgment on all plaintiff's causes of action is GRANTED. The Clerk shall close the file.

IT IS SO ORDERED.

N.D.Cal.,2001.

Adams v. Kmart Corp.

Not Reported in F.Supp.2d, 2001 WL 969049 (N.D.Cal.)

### Motions, Pleadings and Filings (Back to top)

- 3:00CV03885 (Docket) (Oct. 20, 2000)

END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.