**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

**MICHAEL E. QUINN,**

     **Plaintiff,**

          **v.**

**HOME DEPOT, U.S.A., INC.,**

     **Defendant.**

**Docket No. 05-10313RCL**

---

**DEFENDANT HOME DEPOT, U.S.A., INC.'S STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE**

     In accordance with Rule 56 of the Federal Rules of Civil Procedure, Defendant

Home Depot, U.S.A., Inc. ("Home Depot") hereby makes the following statement of

material facts as to which no genuine issue remains to be tried[1]:

1.     Plaintiff Michael Quinn ("Plaintiff" or "Mr. Quinn") was employed at Home

Depot's Waltham, Massachusetts store as a sales associate in the building materials

department from 1996 to January 9, 2004. (*Deposition of Michael Quinn ("Quinn*

*Dep."), attached at Tab 1 to Declaration of Allison Romantz, at pp. 25, 33, 79-80).* Mr.

Quinn's major job duties and responsibilities as a building materials sales associate were

to assist customers, put away freight and maintain the store. (*Quinn Dep., at p. 33*).

2.     As a sales associate in the building materials department, Mr. Quinn was required

---

[1] These facts are deemed undisputed for the purposes of Defendants' Motion for Summary Judgment only.

to operate various types of lift equipment[2] to assist him in moving large and heavy

merchandise.  (*Quinn Dep., at p. 33*).

### Home Depot's Safety Standards for Operating Lift Equipment

3.      Before any Home Depot associate is allowed to operate any of Home Depot's lift

equipment, the associate must first undergo training in the safe operation and use of lift

equipment.  Once the associate has completed the training, Home Depot issues the

associate an operating license which the associate must carry on his person at all times

while operating any type of lift equipment.  (*Quinn Dep., at 34*).  In order to maintain the

operating license, associates must go through a yearly re-certification process which

includes a refresher course on Home Depot's safety rules and standards for operating lift

equipment.  (*Hoban Decl., at ¶ 5*).

4.      Home Depot's safety standards for lift equipment include a requirement that a

seat belt must be worn at all times when operating lift equipment.  In addition, an

associate operating lift equipment must ensure that a spotter is used if the store is open

and the lift is an area open to customers.  (*Hoban Decl., at ¶ 4*).

5.      In 2003, Home Depot issued a Code of Conduct for all employees that, among

other things, defined what constituted a major work rule violation.  Failing to use a

spotter when required and failing to wear a seat belt are both identified as major work

rule violations.   The Code of Conduct provides that a termination is possible for a first

offense of a major work rule violation, although it is left to the discretion of store

management.  A second offense, however, will result in termination.  (*Deposition of

Christophe*r *Hoban ("Hoban Dep."), attached at Tab 3 to Declaration of Allison*

---

[2] Lift equipment includes forklifts, reach trucks, order pickers, electric pallet jacks and other powered materials-handling equipment.  (*Declaration of Christopher Hoban ("Hoban Decl."),  at ¶ 2, attached  as Tab 2 to Declaration of Allison Romantz* ).

*Romantz, at p. 27).*

### Home Depot Reiterates Importance of Its
### Safety Standards in Waltham Store

6.      Approximately six months before his termination, Mr. Quinn attended a meeting at Home Depot in which the then store manager Robert Murphy clearly advised associates that Home Depot of the importance of complying with Home Depot's safety standards and the consequences for not complying.  At this same meeting, associates were reminded that they needed to wear a seat belt at all times when operating lift equipment.  (*Quinn Dep. at p. 38-39*).

7.      At no time **after** this meeting (which occurred approximately six months before his termination) can Plaintiff identify any instance where a member of Home Depot management observed an associate operate lift equipment without wearing a seat belt and the employee was not disciplined. (*Quinn Dep. at p. 41*).

### Plaintiff's Report of Suspicious Conduct on the Part of Two Customers

8.      According to Mr. Quinn, sometime in late summer he was approached by two customers while he was standing in front of a display of snow blowers for sale outside the front of the store.  One of the customers asked Mr. Quinn if "he knew about special deals for snow blowers?"  When Mr. Quinn responded that he did not know what the customer was talking about, the customer stated "You work outside don't you?"  Mr. Quinn advised the customer that he should speak with an associate in the garden department. (*Quinn Dep. at p. 54*).

9.      After leaving the customers, Mr. Quinn approached one of the Assistant Store Managers to report the conversation (*Quinn Dep. at p. 54*).  Although the question posed

to Mr. Quinn by the customer was seemingly innocuous, Mr. Quinn testified that he found it "suspicious" because he claimed to have heard rumors in the store of employees who were allegedly stealing high priced merchandise from the store. Mr. Quinn testified that he believed that this customer had insinuated that Plaintiff was connected to or was involved with associates in the store who would assist customers in stealing high priced merchandise from the store. (*Quinn Dep. at p. 56*).

10.     The Assistant Store Manager told Mr. Quinn that he should report the conversation to the Store Manager, Robert Murphy. (*Quinn Dep. at p. 60*). Mr. Quinn reported the conversation to Mr. Murphy either later that day or the next day. (*Quinn Dep. at p. 61*). Mr. Murphy thanked him for bringing that information to his attention. (*Quinn Dep. at p. 65*).

11.     Approximately one day after telling Mr. Murphy about his conversation with the customer, Mr. Murphy called Plaintiff into his office and said that he wanted Plaintiff to speak with Christopher Bergeron, Home Depot's Regional Loss Prevention Manager, over the telephone to relay his conversation with the customer. (Q*uinn Dep. at p. 61).*

12.     Plaintiff spoke to Mr. Bergeron over the phone and summarized the conversation he had with the customer. Mr. Murphy was present in the office while Plaintiff was speaking to Mr. Bergeron on the phone. (*Quinn Dep., at p. 64*). Mr. Bergeron thanked Mr. Murphy for providing him with this information. (*Quinn Dep., at p. 65).*

13.     Plaintiff's report to Mr. Murphy and Mr. Bergeron had to have occurred prior to August 23, 2003 because Mr. Murphy's employment with Home Depot ended on that date. *(Hoban Decl., at ¶ 6).*

14.     Mr. Quinn has no knowledge as to whether Mr. Bergeron ever informed anyone

else at Home Depot about his report regarding the customers looking for a deal on snow

blowers. (*Quinn Dep., at p. 66).*

15.    In fact, Mr. Bergeron never reported this conversation or the information

communicated by Mr. Quinn to anyone at Home Depot, nor did he make any type of

written report.  *(Deposition of Christopher Bergeron ("Bergeron Dep.") attached at Tab*

*4 to Declaration of Allison Romantz, a  pp. 15-16*).

16.    Mr. Murphy separated from employment at Home Depot on August 23, 2003.

(*Hoban Decl., at ¶ 6*).

### *Plaintiff's Safety Violations*

17.    On or around September 18, 2003, Mr. Quinn was operating lift equipment during

store hours without a spotter on the side of the Home Depot building where stockade

fencing was stored.  (*Quinn Dep. at  p. 44-45*).   This area is open to customers. (*Quinn*

*Dep., at p. 44*).

18.    Laura Sacco, an Assistant Store Manager, observed Mr. Quinn operating lift

equipment without a spotter and instructed him to immediately stop because she believed

he was supposed to have a spotter in the location where he was driving.  She pulled Mr.

Quinn's operating license so that he was prevented from continuing to operate any lift

equipment.  (*Quinn Dep., p. 45*).

19.    Mr. Quinn advised Ms. Sacco that he did not believe that he was required to have

a spotter when operating lift equipment on the side of the building.  (*Quinn Dep., p. 46).*

20.    Plaintiff did not have his operating license for the next three work days and

therefore he could not operate lift equipment during that time.  After three days, his

operating license was returned. (*Quinn Dep., at p. 48*).

21.     Although Mr. Quinn did not receive any written discipline for operating the lift equipment without a spotter on September 18, 2003, his operating license was pulled and Ms. Sacco completed a written performance discussion which documented the counseling and noted that his license had been pulled. (*Declaration of Christopher Hoban, at ¶ 8 and Performance Discussion Tracking Form, attached at Exhibit 2 to Hoban Declaration*). The performance discussion tracking form is a document that is maintained in an associate's personnel file so that Home Depot management has a record reflecting that a performance discussion was held with an associate.  (*Declaration of Christopher Hoban, at ¶ 9).*

22.     On December 27, 2003, Mr. Quinn operated a forklift without wearing a seat belt. (*Quinn Dep., at p. 51).*

23.     Two Assistant Store Managers, Glenn Cowan and Chris Reid, had observed Mr. Quinn operating the lift equipment without a seat belt.  Mr. Cowan approached Mr. Quinn and told him to put on his seat belt.  Mr. Cowan also told Plaintiff that "we're going to talk about this later."  (*Quinn Dep., at p. 51).*

24.     After observing Plaintiff operating the forklift without wearing a seat belt, both Mr. Cowan and Mr. Reid reported their observation to Chris Hoban, the Store's Human Resources Manager, who instructed each to complete a written statement reporting their observation.  (*Declaration of Christopher Hoban, at ¶ 7 and Associate Statements, attached as Exhibit 1 to Hoban Declaration; Christopher Hoban Dep., at pp. 13-14).*

### *Plaintiff's Termination of Employment*

25.     After receiving the Associate Statements from Mr. Cowan and Mr. Reid, the Store Human Resources Manager reviewed Mr. Quinn's personnel file.  Upon reviewing of the

file, Mr. Hoban reviewed the record of the performance discussion with Mr. Quinn two months earlier regarding his use of lift equipment without a spotter which resulted in his operating license being pulled for three days. (*Hoban Dep., p. 15*).

26.     Mr. Hoban then spoke with Ms. Sacco, the Assistant Store Manager about what she had observed. (*Hoban Dep., at p. 15*).

27.     Mr. Hoban then brought the matter to the attention of the new store manager, Peter McNamara who had replaced Mr. Murphy several months earlier. He reviewed with Mr. McNamara the statements from Mssrs. Reed and Cowan as well as the previous documentation in Plaintiff's file from Ms. Sacco. Mr. Hoban recommended to Mr. McNamara that Mr. Quinn be terminated from employment at Home Depot. Mr. McNamara approved the termination decision. (*Hoban Dep., at p. 16; Declaration of Peter McNamara ("McNamara Decl."), attached at Tab 5 to Declaration of Allison Romantz, at ¶ 5).*

28.     The sole reason Mr. Hoban recommended Plaintiff's termination was his belief that Mr. Quinn had had two safety violations within a short period of time. (*Hoban Dep., at p. 19*). At the time that Mr. Hoban made the recommendation, Mr. Hoban had no knowledge that Plaintiff had made a report several months earlier about an alleged suspicious request from a customer seeking a deal on a snow blower (*Hoban Dep., at p. 39*).

29.     At the time that Mr. McNamara approved the recommendation to terminate Mr. Quinn's employment, he had no knowledge that Plaintiff had made a report several months earlier to his predecessor and to the Regional Loss Prevention Manager about a suspicious request from a customer seeking a deal on a snow blower. The sole reason

Mr. McNamara approved the termination was because of Mr. Quinn's two safety violations within a short period of time. (*McNamara Decl., at ¶ 6).*

Respectfully submitted,

HOME DEPOT, U.S.A., INC.,

By its attorneys,


/s/ Allison K. Romantz
Robert P. Joy
Allison K. Romantz
MORGAN, BROWN & JOY, LLP
200 State Street
Boston, MA 02109
617.523.6666


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 16, 2006.


/s/ Allison K. Romantz
Allison K. Romantz

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

MICHAEL E. QUINN,

Plaintiff,

v.

HOME DEPOT, U.S.A., INC.,

Defendant.

Docket No. 05-10313RCL

## DECLARATION OF ALLISON ROMANTZ IN SUPPORT
## OF DEFENDANT HOME DEPOT'S MOTION FOR SUMMARY JUDGMENT

ALLISON ROMANTZ, declares pursuant to 28 U.S.C. § 1746 under penalty of perjury that the following is true and correct:

1.    I am an attorney at Morgan, Brown & Joy LLP and am one of the counsel for Defendant Home Depot U.S.A., Inc. ("Home Depot") in the above referenced matter.

2.    Attached hereto at Tab 1 is a true and accurate copy of excerpts from the deposition transcript of Michael Quinn.

3.    Attached hereto at Tab 2 is a true and accurate copy of the Declaration of Christopher Hoban.

4.    Attached hereto at Tab 3 is a true and accurate copy of excerpts from the deposition transcript of Christopher Hoban.

5.    Attached hereto at Tab 4 is a true and accurate copy of excerpts from the deposition transcript of Christopher Bergeron.

6.    Attached hereto at Tab 5 is a true and accurate copy of the Declaration of Peter McNamara.

Signed under the pains and penalties of perjury this 14th day of February, 2006.

_____

Allison Romantz

**TAB 1**

# ORIGINAL

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO: 05-10313RCL

\* \* \* \* \* \* \* \* \* \* \* \*
\*
MICHAEL QUINN,                        \*
      Plaintiff,                 \*
                                   \*
vs.                                   \*
                                   \*
THE HOME DEPOT, U.S.A., INC.,         \*
      Defendant.                 \*
                                   \*
\* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF MICHAEL E. QUINN, a witness called on behalf of the Defendant, pursuant to the Federal Rules of Civil Procedure, before Janet Kristin Cormier, a Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Law Offices of Morgan, Brown & Joy, 200 State Street, Boston, Massachusetts, on Wednesday, October 5, 2005, commencing at 10:00 a.m.

Page 25

```
1   A.   I believe it was a lack of work.  Oh, the
2        union.
3   Q.   I'm sorry?
4   A.   The union came in and shut down all our
5        work with the Beale Companies.  So we were
6        limited to what we could do, and basically
7        it was a lack of work.
8   Q.   Okay.  And that's when you returned to
9        Herbert Greene?
10  A.   Yes.
11  Q.   And when you were doing the carpentry and
12       renovation, was that also in downtown
13       Boston?
14  A.   Yes.
15  Q.   Was it office work?
16  A.   Condominiums.
17  Q.   Okay.  And why did you stop working for
18       him in '95?
19  A.   I applied for the job at the Home Depot,
20       and they called me and hired me.
21  Q.   What made you apply for the job?  I mean,
22       why did you want to stop working for
23       Herbert Greene?
24  A.   For the same reason as the last time.
```

1       for the entire duration of your employment

2       at Home Depot?

3   A.  Yes.

4   Q.  At the time that you were hired, what

5       position were you hired into?

6   A.  Building materials sales associate.

7   Q.  And what were your job duties and

8       responsibilities as a sales associate in

9       the building materials department?

10  A.  To help customers, to put away freight,

11      keep the store clean.

12  Q.  Did you remain as a sales associate in the

13      building materials department for the

14      duration of your employment at Home Depot?

15  A.  Yes.

16  Q.  In that role, did you have a need to

17      operate any type of machinery?

18  A.  Yes, I did.

19  Q.  And what did you need to operate to do the

20      sales associate job for building

21      materials?

22  A.  Various lift equipment.

23  Q.  And did you receive training from Home

24      Depot before you used the lift equipment

1       on how to operate it?

2   A.  Yes.

3   Q.  And can you tell me about that training?

4   A.  I was taken out in back of the store and

5       told to take six or seven pallets from one

6       spot to another and put them down for

7       about five minutes.  And that was it.

8   Q.  Did you see any videos?

9   A.  Yes, I did see videos.

10  Q.  Okay.  Did you receive any written

11      materials to go along with those videos?

12  A.  Yes, I did.

13  Q.  And did you review those written

14      materials?

15  A.  Yes.

16  Q.  Can you describe for me any more what type

17      of training you said, if any, in terms of

18      operation of the lift machinery?

19  A.  Usually just periodically they would have

20      us watch safety videos, hazardous material

21      videos, just pretty much videos.

22  Q.  Okay.  Did Home Depot have any safety

23      rules regarding the use of the lift

24      equipment that you were aware of?

Page 38

1          that observed the actual person.

2     Q.   That observed the actual person?

3     A.   Yes.  Meaning that it was so -- to me it

4          was so frequent that people were simply

5          told, you need to get a spotter, you need

6          to put your seat belt on, but these -- it

7          wasn't enforced, strictly enforced.

8     Q.   Okay.  Now, I thought I had understood

9          your testimony to be that it wasn't

10         enforced up until the last year, and after

11         the last year it was enforced?

12    A.   It was enforced but not strictly.

13    Q.   Okay.  And was there some point in time

14         where employees at Home Depot were told,

15         you know, in the past we may not have

16         enforced this, but now we're starting to

17         take it more seriously?

18    A.   Yes, yes.

19    Q.   Okay.  And when was that?

20    A.   I'm going to say when the -- probably --

21         probably at a meeting maybe six months

22         before my termination.

23    Q.   And tell me what happened at that meeting.

24    A.   I'm not -- I'm not 100 percent sure, but I

Page 39

1    believe that the discussion came up that

2    safety -- safety was an issue and that the

3    employees had to be more aware of -- of

4    having spotters and partitioning off

5    aisles to be more safety conscientious.

6    Q.    And at that meeting were employees also

7          reminded that they needed to wear a seat

8          belt at all times when operating the lift

9          equipment?

10   A.    I believe so.

11   Q.    Do you recall who it was who communicated

12         that to the employees at this meeting?

13   A.    It was the manager, but I have to think of

14         his name.  It might have been Bob Murphy.

15   Q.    Okay.  And after that meeting, did you

16         ever observe anybody operating lift

17         equipment at that time when a spotter was

18         required without using a spotter and that

19         employee was observed doing that by a

20         member of management and was not

21         disciplined?

22   A.    Yes.

23   Q.    Okay.  Now, with that restriction of, you

24         know, after Bob Murphy had that meeting,

G&M Court Reporters, Ltd.
617-338-0030

Page 41

1     meeting where he told people we're really

2     going to start enforcing this, if a member

3     of management saw somebody operating lift

4     equipment without a seat belt, what would

5     you observe happen?

6  A.  Can you repeat the question, please.

7  Q.  Sure.  Let me see if I can do it a little

8     bit better.

9  A.  Yeah.

10 Q.  From the time -- directing your attention

11    to the time that Bob Murphy had that

12    meeting until the time that you were

13    terminated, did you ever observe an

14    employee operating lift equipment without

15    wearing a seat belt and that fact was

16    observed by a member of management who

17    didn't discipline the employee for not

18    wearing the seat belt?

19 A.  I can't say that I did.

20 Q.  Okay.  When you worked at Home Depot in

21    the last year of your employment, were you

22    familiar with an ASM by the name of Chris

23    Reed?

24 A.  The name strikes a bell.

G&M Court Reporters, Ltd.
617-338-0030

Page 44

1   Q.   Okay.  And were you operating lift

2        equipment?

3   A.   Yes.

4   Q.   Was the store open at the time?

5   A.   Yes.

6   Q.   And I'm not familiar with that particular

7        location in the Waltham store.

8   A.   Right.

9   Q.   So is it where you -- is it where the Home

10       Depot sells fences?

11  A.   It's where we store it.

12  Q.   Where you store it?

13  A.   Yes.

14  Q.   Is it a section of the store that

15       customers can go into?

16  A.   They could walk back there, but they have

17       no reason to.  It's strictly storage.  The

18       fences are sold out front.  They strictly

19       would store it on the side of the

20       building.

21  Q.   Okay.  And on this particular day when

22       Laura Saco spoke to you, were you

23       operating a lift equipment without a

24       spotter out in the section of the

Page 45

1        building?

2    A.    Yes.

3    Q.    Okay.  And what did she say to you?

4    A.    She told me to pull the machine over and

5          give me -- actually told me just to stop,

6          get off the machine and give her my

7          license.

8    Q.    And when she says give you her license,

9          does she mean your driver's license?

10   A.    My operating license for the fork truck.

11   Q.    And is that an operating license that's

12         issued to you by Home Depot?

13   A.    Yes.

14   Q.    Okay.  And did you do so?

15   A.    Yes.

16   Q.    And did she tell you why it was that she

17         was telling to you pull over and to give

18         her your operating license?

19   A.    Yes.

20   Q.    And what did she say?

21   A.    She said I had to have a spotter when I

22         was operating the vehicle.

23   Q.    And what did you say, if anything, in

24         response to her?

Page 46

1   A.    I told her I didn't have to have a
2         spotter.
3   Q.    Okay.  And what did she say in response to
4         that?
5   A.    She said you did and asked me for my
6         license.  Chris -- she was accompanied by
7         Chris Bergeron.  I think she felt
8         pressured.
9   Q.    I'm sorry, what about Chris Bergeron?
10  A.    She was accompanied.  He was walking along
11        with her.
12  Q.    Oh, okay.
13  A.    And she wasn't sure of the rules.  The
14        rules of the Home Depot are when you're
15        unloading freighting, anything on the
16        sides of the building or the rear end of
17        the building did not require a spotter.
18  Q.    Was Chris standing next to her when she
19        had this conversation with you?
20  A.    Yes.
21  Q.    Okay.  And so when you told her you didn't
22        believe that you needed a spotter, did she
23        say anything?
24  A.    She just said, Give me the license.

Page 48

1      you believed to be her error?

2  A.  Yeah, I was shocked that my license was

3      taken away, because no one has a spotter

4      outside the store unless you're in front

5      of the store where the customers are or

6      anywhere where a customer might be.  And I

7      didn't understand why she took it.

8          I got my license back within three

9      days without training, anything.

10 Q.  Did you speak to anyone else at Home

11     Depot?

12 A.  I believe I informed one of the managers

13     inside what had happened.

14 Q.  Do you recall who that was?

15 A.  I honestly don't remember.  But I know I

16     spoke with someone about it.

17 Q.  Okay.  Did Home Depot do anything other

18     than take your operating license away for

19     three days?

20 A.  No, they took my license.  I was not

21     written up for it.  Normally when they

22     took your license, they will write you a,

23     you know, piece of paper, whatever you

24     want to call it.  I'm not familiar with

1           during that time period?

2    A.    I had several managers, which I don't

3          recall their names, simply say you need to

4          get your license back.

5    Q.    Were you working at this Home Depot on

6          Saturday, December 27, 2003?

7    A.    I believe so.

8    Q.    And did you operate lift equipment on that

9          day?

10   A.    Yes.

11   Q.    And did you operate any lift equipment on

12         that day while not wearing a seat belt?

13   A.    Yes.

14   Q.    And where were you at that time?

15   A.    I was located outside the garden gate --

16         the garden department gate.

17   Q.    And did Glen Cowen speak to you at that

18         time about not wearing a belt while

19         operating the lift equipment?

20   A.    Yes.

21   Q.    And what did he say?

22   A.    He approached me and told me you need to

23         put your seat belt on, and we're going to

24         talk about this later.

Page 54

1    of the snowblower display and that one

2    individuals asked you about a special deal

3    on snowblowers.  Do you recall that

4    allegation in the complaint?

5  A.    Yes.

6  Q.    Okay.  And can you tell me a little bit

7        more about that particular incident?

8            MR. WOOD:  Objection.  You can

9        answer.

10  A.    The incident when the individuals

11        approached me?

12  Q.    Yup.

13  A.    Two individuals approached me and asked me

14        if I -- they seemed to know that I worked

15        outside.  And asked me if I knew about

16        special deals that could be worked out

17        with snowblowers.  And I told them I

18        didn't know what they were talking about.

19            And I actually told them to go and

20        speak with the guy in the garden, Ed

21        Draponti, go and speak with him.  But I

22        paged him, and he didn't respond.  So I

23        just basically walked away and went and

24        told one of the assistant managers -- I

Page 56

1    Q.    Did they introduce themselves to you?

2    A.    No.

3    Q.    Did they identify themselves in any way?

4    A.    No.

5    Q.    And other than asking you about whether

6          there was a special deal on snowblowers,

7          did they say anything else?

8    A.    They insinuated that I worked outside and

9          that I should have some sort of knowledge

10         as to why they were having that

11         conversation with me.

12   Q.    Okay.  Can you tell me specifically what

13         it was that they said?

14   A.    Something to the effect that you were work

15         outside, you work outside, and that I

16         should know about it, about a deal on

17         snowblowers.  That's basically it.

18   Q.    Okay.  Why did you find this conversation

19         suspicious?

20   A.    Because I could -- I basically felt that

21         these guys were looking to -- to get a

22         deal other than something that was on

23         sale.

24         They seemed to be like -- you know,

1   A.   No.

2   Q.   And you testified that you went into the

3         store and reported the conversation to

4         who?

5   A.   Janet Wadin.

6   Q.   And what did she say?

7   A.   She -- she told me that -- that -- I

8         explained to her the way that I perceived

9         what they were saying to me.  And she told

10        me that I should go and inform Bob Murphy

11        about it.

12   Q.   And did you?

13   A.   Yes.

14   Q.   And did you immediately go from speaking

15        to Janet to Bob?

16   A.   I believe so.

17   Q.   Okay.  It was that day?

18   A.   I believe so.

19   Q.   Okay.

20   A.   I'm not 100 percent sure, but I did tell

21        him.

22   Q.   Okay.  And tell me about the conversation

23        that you had with Bob Murphy.

24   A.   I told him the same thing I told you

Page 61

1    about, the feeling that I got from these

2    two individuals that they were looking to

3    -- I felt as though they were looking to

4    get an illegal purchase of a snowblower.

5  Q.   And what did he say, if anything, in

6        response to what you told him?

7  A.   I think he just basically said, Okay, and

8        then -- I don't remember a whole lot about

9        that conversation.  I simply, you know,

10       related that to him.  And then sometime

11       after that I was called into the office.

12       I couldn't tell you if it was the same day

13       or the next day.

14            But he told me that he had told Chris

15       Bergeron about it and that he wanted to

16       speak with me on the phone.

17  Q.   That Chris wanted to speak with you on the

18       phone?

19  A.   Yes.  And I told Chris the same story.

20  Q.   Okay.  Before we get to the conversation

21       that you had with Chris, I want to just

22       ask you some questions.

23            You had indicated that at the time

24       that these individuals asked you about the

Page 64

1       where were you when you were having this
2       conversation?
3    A.    I was in the manager's office.
4    Q.    And was anybody else present?
5    A.    Bob Murphy was present.
6    Q.    Okay.  Are you positive Bob Murphy was
7       present?
8    A.    Yeah, I believe he was.
9    Q.    Okay.  Anybody else?
10   A.    No, I don't think so.  No, no one else was
11      in there, it was just me and him.
12   Q.    Was it his office?
13   A.    The manager's office, yes.
14   Q.    Okay.  Door open or closed?
15   A.    Probably closed.
16   Q.    And did one of you, either you or Bob
17      Murphy, call Chris Bergeron?
18   A.    Bob called him.
19   Q.    Okay.  And was it on a speaker phone?
20   A.    Yes.
21   Q.    Did Bob identify himself or participate in
22      this conversation at all?
23   A.    I don't remember.
24   Q.    Okay.  What -- after you told Chris what

Page 65

```
 1          you had observed, what, if anything, did

 2          he say in response?

 3   A.     I believe he just said thank you.

 4   Q.     And am I correct in understanding that as

 5          you sit here today, you don't have a clear

 6          memory as to whether or not this

 7          conversation with Chris took place on the

 8          same day that you first reported it to

 9          Bob.  You're just not sure?

10   A.     Yeah, I'm really not sure.

11   Q.     Okay.  When you told Bob, you know, when

12          Janet first told you you should tell the

13          store manager and you went and told Bob,

14          what did he say to you?

15   A.     I think he just basically listened to me

16          and took in what I said and probably

17          thanked me for it, and I left.

18   Q.     Did he say anything to suggest that he was

19          angry at you for bringing that information

20          to his attention?

21   A.     Not, not at all.

22   Q.     And what about Chris, did Chris say

23          anything on the phone that suggested that

24          he was angry at you for bringing that
```

Page 66

1       information to his attention?

2   A.      No.

3   Q.      Okay.  Have you told me everything now

4           that you recall was said during the

5           telephone conversation with Chris

6           Bergeron?

7   A.      I believe I have.

8   Q.      Okay.  And do you know what, if anything,

9           Chris then did with the information that

10          you communicated to him?

11  A.      No.

12  Q.      Okay.  Do you know if Chris advised

13          anybody else at Home Depot that you had

14          made this report to him?

15  A.      No.

16  Q.      In your complaint you alleged that there

17          had been numerous prior incidents of

18          high-priced items disappearing from the

19          Waltham store.

20              Were you personally aware that there

21          had been high-priced items that were

22          disappearing from Waltham store, or was

23          that just part of the rumor that you had

24          been hearing?

Page 79

1   the rest of the shift?

2 A. No.

3 Q. And did you speak to him after you got

4   done with work?

5 A. No.

6 Q. Okay.  At some point after that did

7   somebody else speak to you about not

8   wearing your seat belt on that particular

9   day?

10 A. No.

11 Q. Never?

12 A. Only when I was terminated.

13 Q. So the next time someone spoke to you was

14   when they told you you were being

15   terminated?

16 A. Right.

17 Q. And when was that in relation to when you

18   had been using the equipment without the

19   seat belt?

20 A. Well, the day that I was observed without

21   the belt was the 27th, I believe.

22 Q. Okay.

23 A. And I was terminated on the first week, I

24   believe, in January.  The 9th, does that

G&M Court Reporters, Ltd.
617-338-0030

Page 80

1        sound right?

2   Q.   Okay.  Did you work between those two

3        dates?

4   A.   Yes.

5   Q.   Okay.  And do you recall how many times

6        you worked?  How many days?

7   A.   At least five days a week.

8   Q.   Okay.  And did you speak to Glen at all

9        during those shifts about what he had

10       observed?

11  A.   I might have spoke to him again, but not

12       about the incident.

13  Q.   Okay.  Did you talk to Chris Reed at all?

14  A.   No.

15  Q.   Okay.  Who was the store human resource

16       manager at that time, if you know?

17  A.   I believe it was Hoban.

18  Q.   Chris Hoban?

19  A.   Chris Hoban.

20  Q.   And do you know when Chris Hoban had

21       become the store human resource manager?

22  A.   No.  It hadn't been long.

23  Q.   It had not been long?

24  A.   I don't believe so.

**TAB  2**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

MICHAEL E. QUINN,

     Plaintiff,

        v.

HOME DEPOT, U.S.A., INC.,

     Defendant.

**Docket No. 05-10313RCL**

## DECLARATION OF CHRISTOPHER HOBAN IN SUPPORT
## OF DEFENDANT HOME DEPOT'S MOTION FOR SUMMARY JUDGMENT

CHRISTOPHER HOBAN, declares pursuant to 28 U.S.C. § 1746 under penalty of perjury that the following is true and correct:

1. I am currently the co-store manager of the Home Depot in Watertown, Massachusetts. Prior to becoming the co-store manager in Watertown, I was the Store Human Resources Manager in Home Depot's Waltham, Massachusetts store.

2. Home Depot has safety standards that associates are required to comply with when operating lift equipment. Lift equipment includes forklifts, reach trucks, order pickers, electric pallet jacks and other powered materials-handling equipment.

3. One of Home Depot's safety standards for lift equipment is that a seat belt must be worn at all times when operating any lift equipment. Another safety standard requires that a spotter must be used by the associate when operating lift equipment at any time when the store is open and the lift equipment is being used in an area that is accessible to customers.

4. In 2003, Home Depot issued a Code of Conduct for all employees that, among other things, defined what constituted a major work rule violation. Operating lift equipment without a spotter at a time when a spotter was required and operating without using a seat belt are identified as major work rule violations.

5. Every Home Depot associate who operates lift equipment must obtain an operating license before operating any equipment. In order for a Home Depot

associate to maintain his or her operating license to operate lift equipment, the associate must go through a yearly re-certification process which includes a refresher course on Home Depot's safety rules and standards for operating lift equipment.

6.     Robert Murphy served as the store manager of the Waltham Home Depot from November 11, 2002 to August 23, 2003.

7.     In or around late December, 2003, two Assistant Store Managers, Glenn Cowan and Chris Reid, submitted written statements indicating that they had observed Mr. Quinn operating lift equipment without a seat belt.  Attached to this declaration as Exhibit 1 are the written statements submitted by Mr. Cowan and Mr. Reid.

8.     After reviewing the written statements by Mr. Cowan and Mr. Reid,  I reviewed Michael Quinn's personnel file to see whether he had previously received any counseling for safety violations.  In his file I saw a performance discussion tracking form in his file that indicated that Assistant Store Manager Laura Sacco had observed Mr. Quinn operating lift equipment without a spotter on the side of the Home Depot in an area that she believed required a spotter.  Ms. Sacco noted on the performance tracking form that she had stopped him, discussed the violation and pulled his operating license. Attached to this declaration as Exhibit 2 is the performance tracking form for Mr. Quinn that references Ms. Sacco's September, 2003 discussion with him.

9.     A performance discussion tracking form is a document that is maintained in associates' personnel files where managers note any performance discussion with the associate so that Home Depot management will have a record reflecting what discussions have occurred with the associate and when those discussions occurred.

Signed on this ___ day of February, 2006 under the pains and penalties of perjury.

_____
Christopher Hoban

2

# EXHIBIT  1

## Associate Statement

To be completed by Asso...

I, _Glenn Cowan_____, residing at _____

_____, am employed at

(Current street address, city, state and zip)

_Home Depot  2674_____. My current position is _Asm._____

(Business Unit/Store number & name)

I have been an associate since ____4/00_____. I am writing this statement of

(Date of hire)

my own free will.  I have not been threatened or coerced into making this statement and no

promises have been made to me in exchange for making this statement.

On Saturday Dec. 27th As i was walking
to outside Garden, I Approached Mike Quinn
who was on the side of the building driving a forklift
Mike was not working wearing A safety Belt
I spoke to Jr. Mike and told him Him i would
be sitting down w/Him to discuss this violation.

Associate Signature : _____

Date : ___12/30/03_____

Time : ___4:00 pm_____

Witnessed by : _____

Witness Printed Name : ___Christobal_____

**To be completed by Assoc...**

## Associate Statement

I, _CHRIS REID_____, residing at _____

_____, am employed at

(Current street address, city, state and zip)

_STORE #2674_____. My current position is __ASM_____.

(Business Unit/Store number & name)

I have been an associate since ___18 FEB 02____. I am writing this statement of

(Date of hire)

my own free will. I have not been threatened or coerced into making this statement and no

promises have been made to me in exchange for making this statement.

ON SATURDAY 12/27/03 I WITNESSED MIKE QUINN,
AN ASSOCIATE IN DEPARTMENT 22 WAS WORKING
OUTSIDE THE GARDEN ROLL-UP GATE, MOVING
PALLETS OF CINDER BLOCK INTO THE INSIDE
RACKING. MIKE WAS USING A PROPANE FORK
TRUCK WITHOUT A SEATBELT ON. I WITNESSED
THIS WITH GLENN COWAN WHO MADE THE
IMMEDIATE CORRECTION WITH THE ASSOCIATE.

Associate Signature : _____

Date : _12/30/03_____

Time : _15:15_____

Witnessed by : _____

Witness Printed Name : _Chris Hoban_____

# EXHIBIT  2

# PERFORMANCE DISCUSSION TRACKING FORM



| st | First Name: *Mike* | Middle Initial: | Location #: *2674* | Dept #: *31/00* |
|---|---|---|---|---|
| *Quinn* | | | | |

This form should be used to document performance discussions held with an associate. Indicate the issue that was discussed and the outcome of the discussion. Provide specific, tangible information. Keep this form in Associate's Personnel File.

Date: *4-3-03*   Mgr/Sup initiating discussion: *Laura Lacce*

Reason for discussion: *Today @ 12:15 Mike was on his personal cell phone while on company time. This could be considered time theft. It is definitely a violation of HD policy.*

Date: *9/18/03*   Mgr/Sup initiating discussion: *Laura*

Reason for discussion: *Mike was observed operating F/L without spotter coming from lumber door around fencing to side of bldg. I took his license + spoke w/ Glenn Cowan who said Mike needed a drug test. License to be returned to Mike upon completion of recertification.*

Date: *11-28-03*   Mgr/Sup initiating discussion: *Rob Delisca*

Reason for discussion: *Mike Trokle Initiative to help and assist in the receiving and unloading of 500 Christmas Trees without being ask to do so.*

Date: _____   Mgr/Sup initiating discussion: _____

Reason for discussion: _____

Date: _____   Mgr/Sup initiating discussion: _____

Reason for discussion: _____

**TAB 3**

1

VOLUME:  I
PAGES:  1 through 41
EXHIBITS:  See Index

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * * * * * * * *

MICHAEL E. QUINN,                 )
              Plaintiff,    )
                         )    Civil Action
    VS.                           )    No. 05-10313 RCL
                         )
HOME DEPOT U.S.A., INC.,          )
              Defendant.    )

* * * * * * * * * * * * * * * * * * * * * * * * * *

**DEPOSITION OF CHRISTOPHER J. HOBAN**, a witness called on behalf of the Plaintiff, taken pursuant to the provisions of the Federal Rules of Civil Procedure, before Kathleen M. McHugh, a Registered Professional/Certified Shorthand Reporter (#120093) and Notary Public in and for the Commonwealth of Massachusetts, at the Law Office of Paul F. Wood, P.C., 45 Bowdoin Street, Boston, Massachusetts, on Friday, October 21, 2005, commencing at 12:00 p.m.

COPLEY COURT REPORTING
101 Tremont Street
Boston, Massachusetts 02108
(617) 423-5841

13

1    at Home Depot?

2         A.    Store human resources manager.

3         Q.    And just briefly, what are the duties

4    of a store human resource manager for Home Depot

5    at that time?

6         A.    Sure.  Human resource managers act as

7    liaison for the line management to ensure that

8    associates are treated properly and fairly.  We

9    handle recruiting, training, not administration

10   but overviews of benefits.  Most communications

11   and employee issues will start through human

12   resources.

13        Q.    Were you assigned to a specific store

14   at that time?

15        A.    I was.

16        Q.    What store was that?

17        A.    The Waltham store.

18        Q.    What was the first communication that

19   you recall concerning the decision to terminate

20   Mr. Quinn?

21        A.    The first communication came from two

22   assistant managers who informed me that they had

23   witnessed an infraction for a potential safety

24   violation by Mr. Quinn.

14

1       Q.      Who were the two managers?

2       A.      Chris Reed and Glen Cowan.

3       Q.      And their jobs were assistant

4   managers?  I'm sorry?

5       A.      Yes.

6       Q.      Also assigned to the Waltham Home

7   Depot?

8       A.      Yes.

9       Q.      How did you communicate with them?  Was

10  it in person or on the telephone?

11      A.      They came into my office.  We

12  communicated in person.

13      Q.      Do you recall the date?

14      A.      That was roughly the 27th or 28th of

15  December.

16      Q.      Okay.  To the best of your

17  recollection, sir, what did they say to you and

18  what did you say to them?

19      A.      They informed me that they noticed Mr.

20  Quinn operating in violation of our company safety

21  standards and I said I'd like a written statement

22  to that effect about exactly what you saw.

23      Q.      Do you recall anything else from that

24  conversation?

15

1      A.      I don't.

2      Q.      What is the next communication that you

3  recall concerning the decision to terminate Mr.

4  Quinn?

5      A.      The next communication was to a third

6  assistant manager.  Upon reviewing Mr. Quinn's

7  file, I noticed a -- a documentation of a previous

8  safety violation a few months earlier.  So I spoke

9  with her about that one.

10     Q.      What was her name?

11     A.      Her name was Laura Sacco, S-a-c-c-o.

12     Q.      Do you recall the date when you spoke

13  to Ms. Sacco?

14     A.      Right around the same time, around the

15  28th, 27th.

16     Q.      Please tell me everything that you

17  recall from that conversation.

18     A.      I reviewed the documentation with Ms.

19  Sacco, asked her if she reviewed it, and asked her

20  for a description of what exactly had happened

21  that day, and she explained about how the

22  operation went and what she witnessed and the

23  conversation she had with Mr. Quinn.

24     Q.      Anything else you recall from that

16

1   conversation?

2        A.    That would be it.

3        Q.    What was the next communication that

4   you recall concerning the decision to terminate

5   Mr. Quinn?

6        A.    At that point I brought it to my boss

7   who was the store manager.  His name was Pete

8   McNamara.  I reviewed the previous documentation

9   and the statements from Mr. Reed and Cowan and

10  recommended to him an action of termination.

11       Q.    Anything else you recall from that

12  conversation?

13       A.    No.

14       Q.    What was the next communication that

15  you had that you recall concerning the decision to

16  terminate Mr. Quinn?

17       A.    At that point he, you know, he looked

18  at it; went over the stuff and said, okay, that's

19  fine.  We can go ahead with the termination.  From

20  that point the only thing I can remember after

21  that was the day where I sat Mike down to let him

22  go.

23       Q.    Why don't you tell me everything that

24  you recall from that meeting?

19

1   speak towards this for seven years.  When I got

2   there in October of '03, the only instances were

3   the previous safety violation which occurred, I

4   believe, right around that time, right before I

5   got there, and the December safety violation.

6   There were no performance issues.

7        Q.    Were those two alleged safety

8   violations the reason for terminating Mr. Quinn?

9        A.    It was.

10       Q.    Were there any other reasons for

11  terminating Mr. Quinn?

12       A.    None.

13       Q.    Okay.

14              MR. WOOD:  Can we have this marked as

15  Exhibit 2, please.

16              (Safety Violation

17  Investigation, consisting of five pages, was

18  marked Exhibit No. 2 for identification.)

19       Q.    I show you what's been marked as

20  Exhibit 2, sir, and ask you to take a moment to

21  familiarize yourself with it.

22       A.    Okay.

23       Q.    Have you seen what's been marked as

24  Exhibit 2 previously, sir?

27

1    Q.    Were these the standards as of

2  December, 2003?

3    A.    No.

4    Q.    What were the standards as of December,

5  2003?

6    A.    The standards were revised in the SOP

7  and also reflected in the Code of Conduct which is

8  on Exhibit 2.

9    Q.    And what were they?

10    A.    That they were a major work rule

11  violation and with major work rule violations,

12  normally, a termination is warranted for a first

13  offense, but it's to the discretion of store

14  management if they feel it's inappropriate, but

15  for a second offense it is termination.

16    Q.    And that is enforced uniformly?

17    A.    Absolutely, for safety violations,

18  absolutely.

19    Q.    As of December, 2003 forward?

20    A.    As of December -- I can speak towards

21  the Waltham store, yes.

22    Q.    Sure, the Waltham store.  And this was

23  enforced uniformly --

24    A.    Yes.

39

1    a copy of his personnel file?

2        A.    Yes.  At one of them he mentioned

3    bringing up or bringing an alleged suspicious

4    behavior by a customer to management's attention

5    and thought that that had something to do with his

6    termination.

7        Q.    When he made that statement to you, how

8    did you respond to him?

9        A.    I responded that I had no idea of what

10   he was talking about.  I'd never heard of such a

11   thing.

12           MS. ROMANTZ:  I don't have any

13   further questions.

14           MR. WOOD:  Okay.

15                (Whereupon the deposition was

16   adjourned at 12:45 p.m.)

17

18

19

20

21

22

23

24

**TAB 4**

1

VOLUME:  I
PAGES:  1 through 38
EXHIBITS:  See Index

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

```
****************************
MICHAEL E. QUINN,                )
            Plaintiff,           )
                                 )   Civil Action
     VS.                         )   No. 05-10313 RCL
                                 )
HOME DEPOT U.S.A., INC.,         )
            Defendant.           )
****************************
```

**DEPOSITION OF CHRISTOPHER M. BERGERON,**
a witness called on behalf of the Plaintiff, taken
pursuant to the provisions of the Federal Rules
of Civil Procedure, before Kathleen M. McHugh, a
Registered Professional/Certified Shorthand
Reporter (#120093) and Notary Public in and for
the Commonwealth of Massachusetts, at the Law
Office of Paul F. Wood, P.C., 45 Bowdoin Street,
Boston, Massachusetts, on Friday, October 21,
2005, commencing at 10:06 a.m.

COPLEY COURT REPORTING
101 Tremont Street
Boston, Massachusetts 02108
(617) 423-5841

15

1    A.    No, I have not.

2    Q.    Did you undertake any sort of

3    investigation?

4                MS. ROMANTZ:    Objection.

5    Q.    You can answer.

6    A.    There was none -- nothing that I had

7    that would afford me to continue an investigation

8    on the matter.

9    Q.    Now, if I understand your testimony

10   correctly, you stated that Mr. Quinn related a

11   situation to you where an individual attempted to

12   purchase a snowblower or snow thrower without

13   going through the register checkout; is that

14   correct?

15   A.    Correct.

16   Q.    Where did Mr. Quinn tell you that this

17   incident took place?

18   A.    On the front pad which is just outside

19   the front entrance of the building where the snow

20   throwers were locked and chained up at the time.

21   Q.    Are there security cameras for that

22   area of the store, sir?

23   A.    Not at that time.

24   Q.    Not at that time, okay.  And I believe

16

1  you testified that you did not discuss this with

2  anyone else besides Mr. Quinn?

3       A.    No, I did not.

4       Q.    Did you make any kind of written

5  report?

6       A.    At the time, no.  There was nothing to

7  write in so many ways.

8       Q.    Does Home Depot have any policies or

9  procedures concerning information such as the

10  information that Mr. Quinn brought to you and what

11  to do with that information?

12       A.    Had his information been more specific

13  and more detailed in our conversation, I would

14  have had him write a statement, but that was

15  not -- there was nothing that he was affording

16  me as far as details that I could make any

17  continuance.

18       Q.    And would that have been pursuant to

19  any Home Depot policy or procedure?

20       A.    For what I was trained under, yes.

21       Q.    And to the best of your knowledge, sir,

22  what policy or procedure was that?

23       A.    I don't know as far as I'm not

24  understanding of the question.  I'm sorry.

**TAB 5**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

MICHAEL E. QUINN,

      **Plaintiff,**

        **v.**

HOME DEPOT, U.S.A., INC.,

      **Defendant.**

**Docket No. 05-10313RCL**

## DECLARATION OF PETER MCNAMARA IN SUPPORT
## OF DEFENDANT HOME DEPOT'S MOTION FOR SUMMARY JUDGMENT

    PETER MCNAMARA, declares pursuant to 28 U.S.C. § 1746 under penalty of perjury that the following is true and correct:

1.     I served as the store manager of the Home Depot in Waltham, Massachusetts from  October 6, 2003 to October 10, 2005.

2.     In or around early January, 2004, the Waltham Store Human Resources Manager, Chris Hoban, came to me with a recommendation to terminate Michael Quinn, a sales associate in the building materials department.

3.     Mr. Hoban's recommendation to terminate Mr. Quinn was based on a recent incident where Mr. Quinn was observed operating a lift truck without use of a seatbelt, which is a major work rule violation.

4.     Mr. Hoban explained that there was also a notation in  Mr. Quinn's file that only a few months earlier, in September, 2003, Mr. Quinn had been spoken to about operating a forklift without a spotter in violation of Home Depot's safety standards.

5.     Based on the fact that Mr. Quinn appeared to have two major work rule violations in a fairly short period of time, I approved the recommendation for termination.

6.     At the time that I approved Mr. Quinn's termination I had no knowledge that he had reported to the prior Store Manager  and the Regional Loss Prevention Manager a situation where he had been approached by some customers who

he believed were asking him to assist them in stealing snow blowers from Home Depot.

7.  I did not learn about this report by Mr. Quinn until I was contacted by Home Depot's legal counsel after Mr. Quinn filed this lawsuit.

8.  My decision to terminate Mr. Quinn was based solely on the information I had been provided by Mr. Hoban regarding Mr. Quinn's recent history of safety violations.

Signed on this 13 day of February, 2006 under the pains and penalties of perjury.

_____
Peter McNamara

2